[Cite as *First Fed. Bank of Ohio v. Angelini*, 2010-Ohio-2300.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### CRAWFORD COUNTY

FIRST FEDERAL BANK OF OHIO,                    CASE NO. 3-09-03

   PLAINTIFF-APPELLEE,

 v.

JOHN ANGELINI, JR., ET AL.,

   DEFENDANTS-APPELLEES,

 and                                                    **O P I N I O N**

TRUSTEE IN BANKRUPTCY FOR
THE ESTATE OF JEFFREY J.
ANGELINI,

   DEFENDANT-APPELLANT.

---

**Appeal from Crawford County Common Pleas Court
Trial Court No. 03-CV-0098**

**Judgment Affirmed**

**Date of Decision:  May 24, 2010**

---

**APPEARANCES:**

   *Timothy A. Shimko* **for Appellant**

   *Stephen E. Chappelear* **for Appellee First Federal Bank of Ohio**

**SHAW, J.**

{¶1} Defendant-Appellant the Trustee in Bankruptcy for the Estate of Jeffrey J. Angelini ("Jeffrey") appeals the February 18, 2009 Judgment Entry of the Court of Common Pleas of Crawford County, Ohio, granting Plaintiff-Appellee First Federal Bank of Ohio's ("First Federal") motion for mistrial on all claims by and between First Federal and Jeffrey.

{¶2} This case arises from a dispute concerning a commercial transaction which took place on January 12, 2001. John and Joyce Angelini, Jeffrey's parents, owned a car dealership in Galion, Ohio. John and Joyce started the car dealership as a sole proprietorship in 1978 under the name Angelini Pontiac and Olds. In 1999, they changed the business' name to Angelini Transportation for reasons unrelated to this case. After graduating high school in 1984, Jeffrey worked full-time at his parents' dealership where he continued to be employed at the commencement of this lawsuit in 2003.

{¶3} Over the course of the years, John and Joyce formed commercial relationships with various local banks to finance the automobile inventory sold at their dealership. First Federal was one of these banks. On January 8, 2001, United Bank, another local bank where John and Joyce held an account, notified First Federal that it had frozen John and Joyce's funds and would not honor any check drawn on that account. As a result of this action, United Bank dishonored

several checks written by Joyce payable to First Federal totaling $842,579.19. First Federal's Vice President of Loans, Rod Vose, called John to notify him that United Bank dishonored the checks. Upon receiving Vose's phone call, John left his dealership and walked the block up the street to First Federal's place of business. There he met with Vose, First Federal's President, Thomas Moore, and First Federal's Legal Counsel, Richard Hottenroth to discuss the situation.

{¶4} John, Vose, Moore and Hottenroth attempted to negotiate a method for John and Joyce to repay the debt incurred from the dishonored checks. From the discussions, it became evident that John and Joyce did not have the financial ability to repay the money immediately. In addition, John and Joyce had several hundred-thousand dollars of existing loans with First Federal including a $300,000 floor plan loan which financed some of the inventory at Angelini Transportation. Vose informed John that this loan was now frozen as a result of the dishonored checks. John asked First Federal to release the titles from that loan so that he could obtain a floor plan loan at another lender in order to stay in business. First Federal agreed to release the titles but only in exchange for additional collateral.

{¶5} First Federal, realizing it essentially had an unsecured loan, sought mortgages on several properties owned by John and Joyce to secure the debt created by the dishonored checks. The negotiations focused on three specific properties: a house owned by John and Joyce located on Sanibel Island, Florida which was in the process of refinancing at the time of the meeting, and two

additional properties which were collectively owned by John, Joyce and Jeffrey each having a one-third interest.[1] On January 12, 2001, Vose, Moore and Hottenroth met with John at his dealership. However, the following testimony regarding the conversations that took place at this meeting depicts two divergent scenarios.

{¶6} Vose, Moore and Hottenroth testified that together they went to Angelini Transportation, on the morning of January 12, 2001, to conduct a "closing" of the loan covering the amount of the dishonored checks (referred to as the "Bad Check Loan"). The total amount of this loan was $849,802.78; $842,579.19 being the amount of the dishonored checks, plus an additional $7,223.59 in interest, fees and expenses incurred in preparing the loan documents. The loan documents set the maturity date for February 15, 2001 and gave First Federal the option to renew the note. In addition, these documents obtained new collateral on the $300,000 floor plan loan. Hottenroth prepared several sets of documents reflecting, among other things, the parties' agreement to execute mortgages on certain properties to secure the debt that John and Joyce owed to First Federal.

{¶7} The primary reason for Jeffrey's participation in the transaction was to sign the appropriate documents giving First Federal a mortgage on the two

---

[1] These properties are known as 201 Erie Avenue, Huron, Ohio and 9680 State Route 314, Lexington, Ohio, and referred to as such through the trial.

properties partially titled in Jeffrey's name. By signing these documents, Jeffrey became the cosigner and guarantor on John and Joyce's Bad Check Loan. However, Jeffrey's obligation as guarantor was limited to value of the property that he mortgaged. In addition, the documents made arrangements for First Federal to receive the refinancing proceeds from the Sanibel Island property once that transaction was complete.

{¶8} Upon their arrival to Angelini Transportation, John directed Vose, Moore and Hottenroth into his office to discuss the transaction. The majority of the meeting took place between John and the three representatives of First Federal. Joyce's presence at the meeting was intermittent, however, she participated in some of the discussion concerning the distribution of the proceeds from the Sanibel Island refinancing and the pledging of the properties held in Jeffrey's name. Although she initially expressed that she believed the entire transaction was unnecessary, she eventually signed the documents. Jeffrey's presence at the meeting was extremely limited. He entered the office only to sign the documents that needed his signature. Vose, Moore and Hottenroth, each testified that none of them conversed with Jeffrey during this meeting.

{¶9} According to further testimony from the representatives of First Federal, no threats of criminal prosecution were made against John during this meeting. In addition, First Federal did not make any agreements with John and Joyce concerning which property was going to be released from the Bad Check

Loan first or how the Sanibel Island proceeds were to be applied. Moreover, none of the documents mentioned threats of prosecution, a schedule of property releases or a specific application of the Sanibel Island funds. After the hour-long meeting, John, Joyce and Jeffrey signed the documents.

{¶10} For the Angelinis' version of this meeting, Jeffrey testified that on the morning of January 12, 2001, Vose, Moore and Hottenroth arrived at the dealership unannounced and met with John in his office. The meeting lasted over an hour. John, Joyce and Jeffrey testified that Hottenroth dominated the majority of the conversation. However, Joyce admitted that she was not present during the entire meeting because she was answering the telephone and attending to the front desk. Jeffrey testified that he was also not present for most of the meeting and only entered John's office to sign the documents. However, Jeffrey testified that because his office was situated next to John's, he could overhear most of the conversation.

{¶11} John and Joyce testified that they discussed in detail the application of the proceeds from the Sanibel Island refinance with Vose, Moore and Hottenroth. Specifically, Joyce stated that she was extremely concerned about Jeffrey's involvement in the transaction as a cosigner and guarantor. Therefore, she wanted a guarantee from First Federal that upon receiving the first payment of $300,000, whether from the Sanibel Island refinance or another source, First Federal would apply the funds to the Bad Check Loan and release the properties

partially titled in Jeffrey's name—thereby releasing Jeffrey as a guarantor. John and Joyce both testified that First Federal verbally agreed to release Jeffrey's properties upon receiving the first payment of $300,000 and to give them a "schedule of release" documenting the order in which the properties were to be released upon payment. John and Joyce testified that they would not have signed the documents absent this agreement.

{¶12} In addition, John and Joyce testified that on more than one occasion during this meeting Hottenroth threatened John with criminal prosecution for check kiting and stated that if the documents were not executed that day, "we will proceed" and John would go to prison. Jeffrey testified that John called him into the office to sign the documents. When Jeffrey entered the office, John summarized Hottenroth's threat—if Jeffrey did not sign, John would go to prison. Jeffrey also testified that after John made this statement to Jeffrey, John asked, "does that sum it up?" and in response Vose, Moore and Hottenroth nodded their heads in agreement. John, Joyce and Jeffrey testified that although none of them read the contents, they thought they had no other choice but to sign the documents.

{¶13} The proceeds of the Sanibel Island refinancing totaling $405,470.21 were wired to First Federal in mid-February 2001. First Federal applied $300,000 of the proceeds to the undersecured Floor Plan Loan. The remaining funds were applied to the Bad Check Loan, however Jeffrey remained the guarantor on the loan. On February 20, 2001, John, Joyce and Jeffrey signed a renewal note

extending the maturity date of the Bad Check Loan. Over the next several months, John, Joyce and Jeffrey signed four additional renewal notes. The final renewal note set November 14, 2001 as the date of payment. However, as of this date, John, Joyce and Jeffrey still owed a substantial amount on the loan obligation. First Federal did not offer an additional renewal and the Bad Check Loan was in default.

{¶14} In April of 2003 First Federal filed a complaint in foreclosure on the Bad Check Loan. The complaint named John, Joyce and Jeffrey Angelini, among others, as the defendants. In 2004, First Federal obtained a final judgment against John and Joyce and an order of foreclosure on certain properties belonging to John and Joyce. John and Joyce declined to file an appeal from that decision. However, Jeffrey appealed that decision which granted summary judgment in favor of First Federal. On appeal, this Court reversed and remanded the matter to the trial court on May 9, 2005. The proceedings were then stayed during the pendency of Jeffrey's bankruptcy. On January 9, 2007, the trial court again granted summary judgment in favor of First Federal. Jeffrey again appealed the decision. This Court found that genuine issues of material fact remained as to specific claims asserted and partially reversed the trial court's grant of summary judgment.

{¶15} On this remand, the remaining claims between the parties proceeded to trial. First Federal sought recovery from Jeffrey as a cosigner and guarantor for

his parents' Bad Check Loan on which a balance of $340,735,46 remained outstanding. Jeffrey asserted three affirmative defenses: (1) Jeffrey claimed that First Federal received payment for his part of the loan obligation but that it wrongfully applied the payment to his parents' other loan obligations; (2) Jeffrey claimed that First Federal obtained his participation in the Bad Check Loan transaction by fraudulently misrepresenting to him that it would apply any payment on his parents' loan to his part of the obligation first, when instead it planned to apply any payment to his parents' other obligations; (3) Jeffrey claimed that he participated in the Bad Check Loan transaction under duress because First Federal threatened to seek his father's prosecution for check kiting.

{¶16} Jeffrey also asserted one counterclaim for damages stating that First Federal fraudulently induced him to cosign and guaranty his parents' Bad Check Loan; that First Federal falsely represented to him that it would first apply any payment to the Bad Check Loan when it knew that representation was false; that Jeffrey relied on this representation by First Federal; and that his reliance caused him to suffer damages.[2]

---

[2] Galion Building and Loan ("Galion") was an original party to this action and was a creditor of John and Joyce Angelini. Galion held mortgages on John and Joyce's property which were subordinate to First Federal's claim. Galion also asserted a claim of fraud against First Federal. As the basis for this claim, Galion maintained that First Federal's alleged fraud against John, Joyce and Jeffrey on the Bad Check Loan caused it to suffer economic damages. However, at the conclusion of the counterclaim evidence presented at trial, the trial court granted First Federal's motion for a directed verdict and dismissed Galion's case finding that it failed to present any evidence to support its fraud claim against First Federal.

{¶17} The jury trial commenced on January 26, 2009 and lasted eight days with each side presenting several hours of testimony from witnesses and submitting hundreds of pages of written exhibits. After the defense rested its case, the trial court provided the jury, both orally and in writing, with its instructions on the law. After closing arguments by counsel, the trial court provided the jury with written interrogatories and verdict forms.

{¶18} On February 6, 2009, the jury returned its verdict with the interrogatory answers. The same six jurors signed both forms. The verdict found in favor of First Federal awarding it $40,735.46 which represented the remaining obligation the jury believed Jeffrey owed as cosigner and guarantor on the Bad Check Loan. However, the verdict also found in favor of Jeffrey on his counterclaim of fraud and awarded him $641,000 in damages. These verdicts alone would appear to be inconsistent.

{¶19} Upon initial review of the interrogatory answers and the verdict, the judge immediately noticed that the answers to interrogatory 5 were both internally inconsistent and inconsistent with the verdict. Interrogatory 5 asked the jury whether Jeffrey sufficiently proved his counterclaim for fraud. In response to the general question, the jury answered "Yes" finding that First Federal obtained Jeffrey's consent to cosign and guaranty the Bad Check Loan by fraudulently making false statements. However, three subparts to the general question followed with each part corresponding to an essential element of the counterclaim.

-10-

{¶20} In part 5(A), the jury wrote down the false statements they believed First Federal made to Jeffrey to induce his consent to sign the loan documents, stating "application of funds from Sanabel Island [sic], schedule of release, release of property (Jeff's)". However, interrogatory 5(B) asked if Jeffrey proved that he relied on those false statements when he agreed to cosign and guaranty the loan. The jury answered "No" finding that Jeffrey did not rely on the false statements by agreeing to sign the loan documents. Finally interrogatory 5(C) asked if Jeffrey proved his reliance on the false statements was "reasonable in all the circumstances." The jury answered "Yes" despite finding in the previous question that Jeffrey did not rely on those statements.

{¶21} The inconsistencies arising from the answers given to interrogatory 5 were apparent on the face of the documents. The jury verdict found in favor of Jeffrey on his counterclaim for fraud. However, as to the specific interrogatories going to an essential element of the claim for fraud, the jury found that Jeffrey did not rely on a false statement when he cosigned on the Bad Check Loan. In addition, the jury's answer to interrogatory 5(B) was inconsistent with the award of damages to Jeffrey on his counterclaim.

{¶22} The judge met with counsel in his chambers and explained the options under Civ. R. 49(B) which are available to the court when the answers to

the interrogatories are inconsistent with the general verdict.[3]  Counsel for both parties agreed with the judge's decision to send the interrogatory and verdict forms back to the jury for further deliberation.

**{¶23}** Shortly thereafter, the jury returned with the verdict and interrogatory forms.  There was no change to the verdict form.  However, the jury changed the answer to interrogatory 5(B) from "No" to "Yes" finding that Jeffrey relied on the false statements by agreeing to cosign and guaranty the loan.  The same six jurors initialed the change.

**{¶24}** As a result of the forgoing deliberation and the change to interrogatory 5(B), the verdict and interrogatory answers now stated as follows:

### A.    The Verdict Form

**1.    On First Federal's claim against Jeffrey Angelini as cosigner and guarantor of his parents' "bad check" loan, we find [mark an "X" in the applicable blank space]:**

**__X__ In favor of plaintiff First Federal and against defendant Jeffrey Angelini and we further find that First Federal should recover [insert an amount] $__40,735.46__ but no more than the foreclosure value of his interest in the properties at 201 Erie Avenue in Huron, Ohio; and 9680 State Route 314 in Lexington, Ohio.**

**_____    In favor of defendant Jeffrey Angelini and against plaintiff First Federal.**

---

[3] Civ. R. 49(B) provides, in pertinent part, "[w]hen one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial."

**On Jeffrey Angelini's counterclaim against First Federal for fraud, we find [mark a "X" in the applicable blank space]:**

**__X__ In favor of counterclaim plaintiff Jeffrey Angelini and against counterclaim defendant First Federal, and we further find that Jeffrey Angelini should recover [insert an amount] $___641,000___.**

**_____In favor of counterclaim defendant First Federal and against counterclaim plaintiff Jeffrey Angelini.**

### B.     *The Interrogatory Answers*

**1.     Did First Federal prove by the greater weight of the evidence that Jeffrey Angelini has some remaining obligation as cosigner and guarantor of his parents "bad check" loan? [insert "Yes" or "No"] __*Yes*__.**

**2.     Did Jeffrey Angelini prove by the greater weight of the evidence that First Federal promised John and Joyce Angelini that First Federal would apply all proceeds from the sale or financing of their Florida property to their "bad check" loan? [insert "Yes" or "No"] __*Yes*__.**

> **A.   If your answer to this interrogatory is "yes," did Jeffrey prove by the greater weight of the evidence that both John and Joyce Angelini would not have signed the transaction documents if First Federal did not make that promise? [insert "Yes" or "No"] __*No*__.**

**3.     Did Jeffrey Angelini prove by the greater weight of the evidence that First Federal promised him it would discharge his obligation to guaranty his parents' "bad check" loan and release its mortgages on the properties at 201 Erie Avenue in Huron, Ohio; and at 9680 State Route 314 in Lexington, Ohio, when it received $300,000 in payment on the "bad check" loan. [insert "Yes" or "No"] __*No*__.**

**4.     Did Jeffrey Angelini prove by the greater weight of the evidence that First Federal promised him it would release its mortgages on the properties at 201 Erie Avenue in Huron, Ohio;**

and at **9680 State Route 314 in Lexington, Ohio before it released the other mortgages it received in that transaction? [insert "Yes" or "No"]** __*Yes*__.

> **A.** **If your answer to this interrogatory is "yes," did Jeffrey Angelini prove by the greater weight of the evidence that he would not have signed the transaction documents if First Federal did not make that promise?** __*No*__.

**5.** **Did Jeffrey Angelini prove by the greater weight of the evidence that First Federal obtained his agreement to cosign and guaranty his parents' "bad check" loan by fraudulently making any false statement or statements with the purpose of causing him to rely on any such statement? [insert "Yes" or "No"]** __*Yes*__.

> **A. If the answer to this interrogatory is "yes," what was the false statement or statements?** __*application of funds from Sanabel [sic] Island, schedule of release, release of property (Jeff's)*__.

> **B. If the answer to this interrogatory is "yes," did Jeffrey Angelini prove by the greater weight of the evidence that he relied on the false statement by agreeing to cosign and guaranty his parents' "bad check" loan? [insert "Yes" or "No"]** __*Yes*__.

> **C. If the answer to this interrogatory is "yes," did Jeffrey Angelini prove by the greater weight of the evidence that his reliance on the false statement was reasonable in all the circumstances? [insert "Yes" or "No"]** __*Yes*__.

**6.** **Did Jeffrey Angelini prove by the greater weight of the evidence that he agreed to cosign and guaranty his parents' "bad check" loan under duress? [insert "Yes" or "No"]** __*Yes*__.

> **A. If the answer to the interrogatory is "yes," what threat did First Federal make that caused him to agree under duress?** __*threat of criminal charges "you don't sign, we will proceed"*__

**B. If the answer to this interrogatory is "yes," did Jeffrey Angelini prove by the greater weight of the evidence that this threat prevented him from exercising free will and judgment? [insert "Yes" or "No"] __*Yes*__.**

**7. Did Jeffrey Angelini prove by the greater weight of the evidence that fraud by First Federal caused him any economic damage beyond his obligations under the agreements we signed? [insert "Yes" or "No"] __*Yes*__.**

**A. If the answer to this interrogatory is "yes," what was the nature of that damage? __*loss of equity*__.**

{¶25} The judge reviewed the verdict and the interrogatory answers again. This time the judge identified what he believed were three additional inconsistencies.

{¶26} First, the jury determined that interrogatory answer 2(A) [John and Joyce would not have signed the transaction documents without the promise to apply all their Florida property proceeds to the Bad Check Loan] was inconsistent with: 1) interrogatory answer 5(A) [which lists "application of funds from Sanabel [sic] Island" as a fraudulent statement made by First Federal]; and 2) paragraph 1 of the verdict [which reduced the amount of First Federal's claim by the precise amount of the Florida property proceeds that First Federal did not apply to the Bad Check Loan].[4]

---

[4] At the time of this suit, $340,735.46 remained outstanding on the Bad Check Loan. First Federal applied $300,000 from the Sanibel Island Proceeds to the Floor Plan Loan. Essentially, the jury found that had First Federal applied the $300,000 to the Bad Check Loan, Jeffrey still owed the remaining $40,735.46 as the cosigner and guarantor.

-15-

{¶27} Second, the judge believed that the revised answer to interrogatory 5(B) [stating Jeffrey relied on First Federal's fraudulent statements by agreeing to cosign and guaranty John and Joyce's Bad Check Loan] was inconsistent with: 1) interrogatory answer 1 [stating Jeffrey had some remaining obligation as a cosigner and guarantor of parents' Bad Check Loan]; and 2) paragraph 1 of the verdict [First Federal should recover some money from Jeffrey Angelini as cosigner and guarantor of that loan].

{¶28} Third, the judge believed that interrogatory answer 6(B) [First Federal's threat of criminal prosecution prevented Jeffrey from exercising free will and judgment] was inconsistent with: 1) paragraph 1 of the verdict [First Federal should recover some money from Jeffrey Angelini as cosigner and guarantor of his parents' Bad Check Loan]; 2) revised answer to interrogatory 5(B) [Jeffrey Angelini relied on the false statement by agreeing to cosign and guaranty his parents' Bad Check Loan]; and 3) paragraph 2 of the verdict [Jeffrey Angelini should recover damages that he sustained by his reliance on First Federal's fraudulent statements].

{¶29} As a result of these apparent inconsistencies, the court again asked the jury to further deliberate and the judge also reread the applicable portion of the written jury instructions entitled "Damages" of which each juror had a copy. The jury retired for the third time and after a short deliberation returned with the interrogatories and verdict forms unchanged. As a result, the verdict and the

interrogatory answers quoted above are the final verdict and interrogatory answers now under appeal.

{¶30} The court met with counsel in chambers to discuss the situation. Both counsel and the court agreed that there was no reason to request the jury to deliberate for a fourth time. First Federal then moved for a mistrial on two grounds: (a) the interrogatory answers are inconsistent with the verdict; and (b) misconduct of Jeffrey's counsel in closing argument denied first federal a fair trial.

{¶31} The court deferred ruling on First Federal's motion for mistrial and advised counsel that it would receive the verdict but would not enter a judgment until the matter could be considered further. The judge returned to the courtroom to dismiss the jury and recessed the proceedings.

{¶32} On February 18, 2009, the trial court concluded that it would be inappropriate to enter judgment on the case given the inconsistencies between the answers to the interrogatories and verdict as well as the internal inconsistency in the verdict. As a result, the trial court granted First Federal's motion for mistrial on this ground. In addition, the trial court cited as additional ground for mistrial the misconduct of Jeffrey's counsel and stated that this misconduct deprived the parties of a fair trial. After thoroughly stating its rationale for granting First Federal's motion for mistrial in its Judgment Entry, the trial court ordered a new trial pursuant to Civ. R. 49(B).

{¶33} Jeffrey timely filed his appeal to this Court asserting the following assignments of error.

### ASSIGNMENT OF ERROR I

**THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING A NEW TRIAL FOLLOWING THE JURY'S RETURN OF ITS VERDICT.**

### ASSIGNMENT OF ERROR II

**THE TRIAL COURT ABUSED ITS DISCRETION IN NOT ENTERING JUDGMENT ON BEHALF OF THE TRUSTEE ON TRUSTEE'S COUNTERCLAIMS AND ON FIRST FEDERAL'S COMPLAINT.**

{¶34} Because the assignments of error both relate to the issue of whether the trial court properly granted a new trial, we elect to discuss them together.

*The First and Second Assignments of Error*

{¶35} In both his assignments of error, Jeffrey argues that the trial court abused its discretion in not entering judgment on the parties' claims and granting a new trial. The court stated two reasons as its basis for declining to enter judgment and granting a new trial. First, the interrogatories answers were inconsistent with the verdict and the verdict itself was inconsistent. Second, the misconduct of Jeffrey's counsel denied the parties a fair trial. We will separately address each of the trial court's reasons in turn.

*Inconsistencies with the Interrogatory Answers and Verdicts*

**{¶36}** When one or more of the interrogatory answers is inconsistent with the general verdict, Civ. R. 49(B) provides for three options available to the court. The court may (1) enter judgment in accordance with the answers, (2) return the jury for further consideration of its answers, or (3) order a new trial. The decision to exercise any one of these options is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Tasin v. SIFCO Industries, Inc.* (1990)*,* 50 Ohio St.3d 102, paragraph one of the syllabus, 553N.E.2d 257. An abuse of discretion connotes more than an error of law or judgment and implies that the trial court's attitude in reaching its decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. Additionally, we note that a trial court's decision in exercising these three options should reflect the degree of confidence that the court has in the jury's ability to resolve the inconsistency "without compromising the fairness of the process or the integrity of the result." See *Phillips v. Dayton Power and Light Co.* (1996), 111 Ohio App.3d 433, 448, 676 N.E.2d 565.

**{¶37}** As outlined in detail above, the trial court found both the verdict and the interrogatory answers to be tainted by the same fundamental inconsistency. The jury found Jeffrey liable as cosigner and guarantor on his parents' Bad Check Loan. However, the jury also found that First Federal obtained Jeffrey's signature

on the loan by fraud and that Jeffrey signed the note under duress. These findings are in conflict with one another. First Federal cannot recover anything from Jeffrey if it fraudulently obtained his approval to cosign on the Bad Check Loan or if it obtained his approval under duress. Moreover, the interrogatory answers and the verdict are inconsistent with the instructions that the trial court gave the jury.

{¶38} The instructions entitled "Fraud as an Affirmative Defense" and "Duress as an Affirmative Defense" both stated "if you find that Jeffrey Angelini proved his defense by the greater weight of the evidence, you should find that he had *no obligation* for this transaction." Despite the clarity of this instruction, in response to interrogatory 1, the jury found that Jeffrey had some remaining obligation as cosigner and guarantor even though it found that First Federal obtained Jeffrey's participation in the transaction via both fraud and duress. Thus, despite finding that Jeffrey adequately proved his affirmative defenses; the jury awarded First Federal an amount that it believed Jeffrey owed as cosigner on the Bad Check Loan.

{¶39} Moreover, the section of the jury instructions entitled "Damages" stated:

> **If you find that Jeffrey Angelini proved by the greater weight of the evidence that either his second or his third affirmative defense of fraud and duress, then your verdict should be for Jeffrey Angelini and against First Federal's claim against him for *any* payment on the 2001 promissory note**.

Notably, the court read this section to the jury after they returned from deliberations for the second time and prior to sending them to further deliberate for the third time. The court also instructed the jury to reread and consider this section as they deliberated.

{¶40} After receiving these instructions, the jury returned for the last time with the verdict and the interrogatory forms unchanged. The trial court concluded that returning the interrogatory and verdict forms to the jury to deliberate again would not assist the jury to resolve the inconsistencies. Under Civ. R. 49(B) two options remained available to the trial court. It could enter judgment in accordance with the answers, notwithstanding the verdict, or order a new trial. Because the answers to the interrogatories and the verdict rested on the same fundamental inconsistency the trial court could not enter judgment on the jury's answers. Therefore, the only remaining choice for the trial court was to order a new trial. Accordingly, we cannot conclude that the trial court abused its discretion in ordering a new trial pursuant to Civ. R. 49(B).

*Misconduct of Jeffrey's Counsel*

{¶41} In its final judgment entry granting the mistrial, the trial court also noted numerous instances of misconduct on the part of Jeffrey's counsel, Attorney Shimko, which took place before and during the trial. The misconduct during the trial consisted primarily of Attorney Shimko flagrantly disregarding specific rulings by the trial court prohibiting the mention of certain matters to the jury

and/or as to the examination of certain witnesses. In most instances, counsel not only defiantly disregarded specific rulings by the trial court by proceeding to make the prohibited arguments to the jury and/or to conduct the prohibited inquiry with a witness, but then proceeded to argue with the trial judge in front of the jury whenever the judge would remind counsel of the prior rulings of the court.

{¶42} Moreover, upon our review of the record on this issue, we have also noted numerous instances of potential misconduct by Attorney Shimko which occurred outside the presence of the jury and as such may not have been directly relevant to the mistrial. The majority of these instances involve Attorney Shimko's direct and repeated attacks on the trial judge's personal integrity by accusing the judge of bias and of failing to act with impartiality.[5]

{¶43} However, it is our conclusion that the conduct of Attorney Shimko is more appropriately addressed in other forums.[6] In this case, we have found that the decision of the trial court to order a new trial was fully warranted under Civ. R. 49(B) apart from any issue of attorney misconduct. Accordingly, we find it

---

[5] During the trial proceedings and even in the briefs submitted to this Court, Attorney Shimko repeatedly accuses Judge Markus of being biased and partial to First Federal's case, up to and including accusing Judge Markus of being an advocate for First Federal by contriving the grounds for which a mistrial could be granted. Despite Judge Markus' denial of any bias, repeated requests to Attorney Shimko to refrain from making such accusations and eventual threat of criminal contempt, Attorney Shimko continued to launch attacks on the judge's objectivity and impartiality.

[6] See Prof. Cond. Rule 8.2(a) which states, in pertinent part: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judicial officer, or candidate for election or appointment to judicial office." See also Jud. Cond. Rule 2.15(B) which states, in relevant part: "A judge having *knowledge* that a lawyer has committed a violation of the Ohio Rules of Professional Conduct that raises a question regarding the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the *appropriate authority*."

unnecessary to discuss whether the conduct of Attorney Shimko independently satisfied the standards for granting a new trial pursuant to Civ. R. 59(A)(2), except to say that we find no abuse of discretion on the part of the trial court in referring to the misconduct of counsel as an additional basis for granting the mistrial.

In sum, it is our conclusion that the jury's obvious inability to reconcile the inconsistencies between the interrogatories and the verdict created a sufficient basis for the trial court to decline entering judgment and declare a mistrial. As such, we find no abuse of discretion or error in the trial court's conclusion to order a new trial pursuant to Civ. R. 49(B). Accordingly, both of Jeffrey's assignments of error are overruled.

**{¶44}** Based on the foregoing, the Judgment of the Court of Common Pleas of Crawford County is affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur**

**/jnc**